UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN GIUCA,

                         Petitioner,

        -against-

WILLIAM LEE, WARDEN, Greenhaven
Correctional Facility

                      Respondent.

------------------------------------------------------------x

**MEMORANDUM AND ORDER**

Case No. 12-CV-02059 (FB)

*Appearances:*
*For the Petitioner:*
LLOYD EPSTEIN, ESQ.
Epstein & Weil LLC
225 Broadway, Suite 1203
New York, NY 10007

*For the Respondent*:
CHARLES J. HYNES, ESQ.
District Attorney Kings County
BY:    DIANE R. EISNER, ESQ.
          Assistant District Attorney
Kings County District Attorney's Office
350 Jay Street
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

        Petitioner John Giuca ("Giuca") seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254 ("§ 2254").  The petition is denied.

**I**

        Following a jury trial, Giuca was convicted of second-degree murder, first-

degree robbery, and second-degree criminal possession of a weapon.[1]  On October 19, 2005,

he was sentenced by the Supreme Court, Kings County (Marrus, J.) to concurrent terms of

imprisonment totaling twenty-five years to life. Giuca appealed, claiming improper

---

[1]The convictions stemmed from the robbery and murder of a college student named Mark
Fisher.  Giuca and friend Antonio Russo ("Russo") were charged with the murder and
related crimes.  The two were tried jointly before separate juries, and Russo was also
convicted of second-degree murder and first-degree robbery. *People v. Russo*, 81 A.D.3d 666
(2d Dep't 2011).  The Government's position was that Russo shot Fisher at Giuca's behest.

admission of evidence, prosecutorial misconduct, error in the court's jury instructions, and ineffective assistance of counsel.  On January 20, 2009, the Appellate Division unanimously affirmed the judgment of conviction on the merits, concluding that "there was overwhelming evidence of defendant's guilt."  *People v. Giuca*, 58 A.D.3d 750, 751 (2d Dep't 2009).  The New York Court of Appeals denied leave to appeal.  *See People v. Giuca*, 12 N.Y.3d 915 (2009).

       While Giuca's direct appeal was pending, he filed a § 440.10 motion to vacate his convictions.[2]  The motion was premised upon Giuca's claim that he had recently learned of juror misconduct occurring during the course of his trial.  On April 1, 2009, Justice Marrus denied the motion without an evidentiary hearing.  *See People v. Giuca*, 23 Misc.3d 1104(A) (Sup. Ct. Kings Co. 2009).  The Appellate Division affirmed, *see People v. Giuca*, 78 A.D.3d 729 (2d Dep't 2010), and the New York Court of Appeals denied leave to appeal.  *People v. Giuca*, 16 N.Y.3d 859 (2011).  On April 26, 2012, Giuca timely filed this § 2254 petition.  In it he essentially makes the same arguments of juror misconduct he unsuccessfully advanced in his § 440.10 motion in the courts below, and once again asks for an evidentiary hearing.[3]

       Given the thoroughness and correctness of Justice Marrus' decision, the

---

[2]Giuca filed the motion pursuant to § 440.10(f) and (h), which permit a defendant to move before the court of conviction at any time to vacate a judgment on the grounds that it was obtained in violation of his constitutional rights, § 440.10(f), or where "[i]mproper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom," N.Y. CRIM. PROC. LAW §§ 440.10(1)(h) (2012).

[3]Oral argument was held on March 15, 2013.

merit-based affirmance by the Appellate Division, and the strictures of federal habeas review under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Giuca's habeas petition must be denied.  The case is remarkable, however, not for any legal complexities, but because of the sensational nature of Giuca's mother's clandestine efforts to vindicate her son.  As Justice Marrus recounted, two years after the trial Doreen Giuliano ("Giuliano")—Giuca's mother—contacted one of the jurors "without information that [the] juror had done anything improper, lied to him about who she was and why she was speaking to him, engaged in a long-term, quasi-romantic relationship with the juror during which she repeatedly manipulated their conversations to get him to speak about this case, and surreptitiously recorded some of their conversations."  23 Misc. 3d 1104(A), at *1.

Giuca's mother's extraordinary exploits received wide media attention, as exemplified by a lengthy magazine article in *Vanity Fair,* titled "Mother Justice."  It recounted that she seized upon this particular juror, Jason Allo ("Allo"), juror number 8, simply because a friend of her son's, who had attended the trial, later realized that the juror was someone from the neighborhood.  It explained how she went to extraordinary lengths to transform herself into a sex-bomb, furnished a rented apartment as a "playgirl's pen," created a fake ID and secret cell-phone account, and "went to an espionage-supply store in Manhattan and bought the most expensive kind of hidden recording device she could find."  Christopher Ketcham, *Mother Justice*, VANITY FAIR, Jan. 2009.

Giuliano's secret recordings of her conversations with Allo, after she was able to surreptitiously meet and befriend him, together with some itinerant affidavits, were the foci of the  motion before Justice Marrus.  There, as well as in his habeas petition, Giuca

contends that the recordings, in particular, demonstrate that Allo intentionally concealed, both before and during the trial, personal knowledge of some of the central issues and people involved in his case, and that Allo violated instructions not to read or listen to media coverage of the case during the trial.

In his decision, Justice Marrus gave three reasons for rejecting Giuca's motion without the need for an evidentiary hearing: (1) the affidavits submitted by Giuca were "rank hearsay"; (2) the audio recordings could not be relied upon due to concerns about their completeness, authenticity and reliability; and (3) substantively, the recordings did not establish juror misconduct. In affirming, the Appellate Division agreed, stating that "[t]he affidavits submitted by the defendant contained only hearsay allegations concerning the conduct of the subject juror and therefore were insufficient to support the motion," and that the defendant's submissions "failed to establish the accuracy or authenticity of [the] recordings, and the oral statements contained therein did not constitute 'evidentiary facts.'" 78 A.D.3d at 730. The appellate court further held that "the recorded statements attributed to the subject juror upon which the defendant relied in support of his motion, even if true, would not entitle the defendant to vacatur of the judgment of conviction." *Id.* at 729-30.

Under AEDPA—which governs a federal district court's power to grant a writ of habeas corpus to a state prisoner for an invalid conviction in a state court proceeding—if a state court rendering a final determination rules on the merits of a claim, that ruling can only be reversed by the district court if it was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the

4

facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);

*see also Williams v. Taylor*, 529 U.S. 362, 402-11 (2000) (explaining deference required by

AEDPA).[4] Plainly, the state courts' decisions here do not fall within either of those

conscripts, but even in the absence of AEDPA, they are correct.  Giuca's mother's inventive

and passionate, but misguided, efforts to come to her son's aid do not, and cannot, trump

the stark reality that under the law there is no basis to tamper with her son's convictions.

## II

"[A] trial court is required to conduct a post-verdict evidentiary hearing on

the issue of juror misconduct only when 'there is clear, strong, substantial and

incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred

which could have prejudiced the trial of a defendant.'"  *Williams v. Artus*, 691 F. Supp. 2d

515, 526 (S.D.N.Y. 2010) (quoting *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d

Cir. 1983) (finding that post-trial hearings should not be held to "afford a convicted

defendant the opportunity to conduct a fishing expedition")); *see also United States v.*

*Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) ("The duty to investigate arises only when the

party alleging misconduct makes an adequate showing of extrinsic influence to overcome

the presumption of jury impartiality.").  The Second Circuit has explained:

> [H]earings such as the one that [petitioner] request[s] should
> be avoided whenever possible.  We are always reluctant to
> haul jurors in after they have reached a verdict in order to

---

[4]In assessing the propriety of a final state court determination, a federal district court may
draw upon a lower state court's treatment of the issue.  *See Washington v. Goord*, 2010 WL
2594310, at *2 (S.D.N.Y. June 22, 2010) (stating that on habeas, "considerable deference" is
granted to the "state courts' prior determinations of both law and fact") (citing *Uttecht v.*
*Brown*, 551 U.S. 1, 9–10 (2007)).

> probe for potential instances of bias, misconduct or extraneous influences. As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.

*Ianniello*, 866 F.2d at 543 (citation and internal quotation marks omitted). "[An] inquiry should end whenever it becomes apparent to the trial judge that reasonable grounds to suspect prejudicial impropriety do not exist." *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) (citation and internal quotation marks omitted).

As for affidavits, a post-verdict evidentiary hearing is warranted only where they contain "assertions of fact that [the affiant] is in a position to establish by competent evidence." *United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987). "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." *Id.*; *see also D'Ercole v. United States*, 361 F.2d 211, 212 (2d Cir. 1966) (affidavit containing hearsay statements could not support habeas petition); *Hayden v. United States*, 814 F.2d 888, 892 (2d Cir. 1987) (hearsay statements regarding juror bribery did not warrant evidentiary hearing: "A standard that would entitle a petitioner, based solely on hearsay information . . . to a full evidentiary hearing [regarding juror corruption] would too easily lend itself to abuse, because such hearsay is too easily manufactured."); *Taus v. Senkowski*, 293 F. Supp. 2d 238, 250 (E.D.N.Y. 2003) (failure to submit affidavit containing personal knowledge of essential facts was proper ground for denying motion to set aside verdict based upon alleged juror misconduct).

The affidavits which Giuca submitted in support of his motion were from Giuliano, two private investigators, and an attorney. Giuliano's affidavit recounts alleged conversations she had with Allo allegedly telling her that he spoke to his cousin during the trial who told him that she knew members of the defendant's gang, that the defendant was a "big shot" known to her as "Slim," and that she overheard "guys" who "hung out" with the defendant say that "they didn't believe it happened but in a sense they knew it did happen because of the way they are."  Petr's Br. Ex. K (Giuliano Aff.) ¶ 9.  Giuliano also states in her affidavit that Allo told her that he disobeyed court instructions not to read newspaper accounts during the trial; moreover, he told her that he would have been disqualified if he disclosed that he knew some members of the defendant's gang — the "Ghetto Mafia" — including brothers Jesse and William "Billy" Wenzel, and that his cousin used to date a third brother, Wayne Wenzel. *Id.* ¶¶ 9-10.  The affidavit from one of the private investigators, Elizabeth Ghormley, relates a conversation she had with Billy Wenzel basically reiterating what was contained in Giuliano's affidavit.  The other investigator's affidavit, as well as the affidavit of the attorney, merely state that neither Allo nor his cousin would speak to them.

The state courts were correct in viewing the alleged conversations of Giuliano with Allo and Ghormley with Billy Wenzel as inadmissible hearsay.  As such, the cases relied on by Giuca are inapposite because they each entail affidavits by jurors or other witnesses who could testify about juror misconduct that they had directly witnessed. *See United States v. Colombo*, 869 F.2d 149, 150-51 (2d Cir. 1989) (affidavit from alternate juror); *Remmer v. United States*, 350 U.S. 377, 380-81 (1956) (juror told trial judge about

inappropriate communications); *United States v. Vitale*, 459 F.3d 190, 194 (2d Cir. 2006) (letter from prosecutor who had firsthand knowledge); *Williams v. Price*, 343 F.3d 223, 226-27 (3d Cir. 2003) (affidavit from juror).

   In any event, Giuca claims that the veracity of the conversations referenced by Giuliano in her affidavit, and in his attorney's briefs, are corroborated by the recorded conversations Giuliano had with Allo.  Even assuming that Giuca could overcome the hearsay issues inherent in these recordings, *see United States v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990) ("Each hearsay statement within multiple hearsay statements must have a hearsay exception in order to be admissible"), the state courts were also correct in ruling, nonetheless, that the recordings were inadmissible.  Specifically, as Justice Marrus noted, Giuca did not submit any affidavit stating that the recordings represented a "complete and accurate reproduction of the conversations between Giuliano and [Allo]," or that they had not been altered in any way.  23 Misc.3d 1104(A), at *3.  Justice Marrus also correctly pointed out that Giuca's attorney had "no way of knowing the genuineness, accuracy and chain of custody of these tapes because he did not oversee or participate in their compilation," and that counsel's submission of additional recorded conversations subsequent to the filing of the motion cast further doubt on their completeness and accuracy.  *Id.*  Finally, Justice Marrus correctly discerned that when listening to the recordings — which the Court has also done — it was "evident that they randomly begin and end, are not date or time stamped, [] contain gaps in the conversations, [and] are also not completely audible or decipherable."  *Id.* at *4; *see United States v. Morrison*, 153 F.3d 34, 36-37 (2d Cir. 1998) (requiring "clear and convincing evidence of authenticity for admission

of recordings," such as expert testimony that there was no indication recordings had been tampered with).

In addition, when listening to the recordings the Court heard that a number of them contain introductions by Giuliano with editorial comments of her conversations with Allo. *See Stapleton v. Greiner*, 2000 WL 1207259, at *8 (E.D.N.Y. July 10, 2000) (audio recording excluded where "conversation had not been recorded continuously" and recordings began with "an introduction by petitioner's wife outlining what would follow."). Further, although Giuca asserts that Giuliano's affidavit authenticated the recordings by swearing that the audio recordings "accurately reflect" her conversations with Allo, Petr's Br. at 17, this is not the case; Giuliano's affidavit states only that submissions accompanying Giuca's motion contained "draft transcripts of the pertinent portions of the [recorded] conversations." Giuliano Aff. ¶ 8.

### III

Although the state courts need not have addressed the substantive contents of the recordings, it was prudent to do so to dispel the notion that there may have been any substantive indicia of juror misconduct, given the sensational nature of the means by which Giuliano ensnared Allo into her spider's web. The Court has similarly substantively analyzed the information contained in the recordings and agrees with the state courts' conclusions. Curiously, in a number of respects, the recorded conversations are at a variance with what Giuliano relates in her affidavit, as well as in Giuca's lawyer's briefs.

A.  **Concealment of Information During** *Voir Dire*

Tracking the claims of his mother's affidavit, Giuca first asserts that Allo committed juror misconduct because he purportedly failed to report to the trial court during *voir dire* that he recognized Jesse and Billy Wenzels' names when read from the list of potential witnesses,[5] and that Allo improperly concealed his personal knowledge of Giuca during jury selection.

"A party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and second, that the correct response would have provided a valid basis for a challenge for cause." *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 554, 556 (1984)).

The recordings do not reflect that Allo recognized either Jesse or Billy Wenzels' names.  To the contrary, Allo tells Giuliano that when the court read the witness list, he "didn't know any of their names."  Recording dated Oct. 2007; *see also* Recording dated Nov. 2007 (stating that he didn't know Ghetto Mafia gang members).  Neither do the recordings reflect that Allo ever recognized Giuca's name or had any prior personal knowledge of him.  Quite the opposite, Allo can be heard telling Giuliano that prior to the trial he did not know Giuca and had never met him.  Recording dated Dec. 2007 ("I didn't know [Giuca] . . . I never even heard of him."); Recording dated Nov. 2007 ("No I didn't know [Giuca] . . .  I never seen the kid.").  Consequently, Giuca has not satisfied the first prong of the *McDonough* standard.  *See McDonough*, 464 U.S. at 556 (requiring

---

[5]Wayne Wenzel was not included on the list of potential trial witnesses.

demonstration that juror's *voir dire* response was false); *United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994) ("[T]hreshold requirement of the *McDonough* test . . . [is] juror dishonesty.").

Moreover, Allo's own statements cast doubt that any arguable failure to report could have prejudiced the trial.  Neither Jesse nor Billy Wenzel appeared as witnesses during Giuca's trial.  Likewise, in the recordings Allo repeatedly states his belief that the prosecution had proven its case, and that "the evidence was all there."  Recording dated Oct. 2007; *see also* Recording dated Nov. 2007 (same).

**B. Improper Discussion of Case During Trial**

Giuca next contends that Allo had a conversation during the trial with his cousin who told him that she was "real tight" with Giuca's fellow gang members, and had overheard some of them discussing the murder and their belief that Giuca was responsible.  Giuca claims that this must have unduly influenced Allo.  However, once again, the recordings are not apposite.

Tracking his mother's affidavit, Allo is heard on the recordings telling Giuliano that his cousin overheard Ghetto Mafia members saying "that they didn't believe that it [the murder] happened but in the same sense they knew that it did happen because of the way they are."  Recording dated Nov. 2007.  However, Giuca is not identified as the perpetrator, nor is it clear who the last "they" refers to.  Tellingly, Allo indicates to Giuliano that he had not spoken with his cousin about the case during the trial: "When I was on trial I didn't really speak, I wasn't really speaking with my cousin like that."  Recording dated Oct. 2008.

11

### C.  Reading Newspapers During Trial

Giuca also asserts that he was prejudiced by Allo's having read newspaper articles that contained information heard only by the jury in co-defendant Russo's trial. These articles purportedly discuss Russo's out-of-court statements to his ex-girlfriend implicating Giuca as the shooter—statements that were "inadmissible against Giuca." Giuca claims that Allo read these newspaper articles during the trial, and that they unduly influenced his verdict.  In support, Giuca identifies a *New York Post* article describing Russo's ex-girlfriend's testimony that Russo "gave her a series of flip-flopping accounts of what happened," first "admi[tting] that he was the shooter," then "adjust[ing] his story to say 'John [Giuca] shot [the victim].'"  Zach Haberman, *Slay Teen's Sick Blame Game- Ex Tells of Grid-Shoot Suspect's Crazed Call*, N.Y. POST, Sept. 20, 2005 at 17.  Aside from this article, Giuca does not identify any other newspaper article that Allo allegedly read during the trial.

Initially, nothing in the record reflects that Allo read this *New York Post* article.  And while the recordings contain a single statement by Allo that he "read [newspaper(s)]," Recording dated Nov. 2007, there is no indication as to which newspapers he read, or more importantly, when this occurred.  Regardless, Giuca cannot demonstrate prejudice because he was convicted of felony murder—a crime which did not depend upon whether or not he was the actual shooter.  Furthermore, the recordings reflect that Allo believed Russo was the shooter—Allo repeatedly tells Giuliano that Giuca "ordered [Russo] to kill," and that "the shooter got" a different sentence than "the kid," a nickname that Allo often used to refer to Giuca.  Recording dated Oct. 2007.  In any event, as Justice

Marrus correctly explained, "mere exposure to accounts in newspapers pertaining to a defendant and his conduct, without more, is insufficient to rebut the presumption of a juror's impartiality and to warrant disqualification." *Giuca*, 23 Misc.3d 1104(A), at *6 (quoting *People v. Costello*, 104 A.D.2d 947, 948 (2d Dep't 1984)).

## D.  Religious Bias and Employer's Comments

Finally, Giuca contends that the recordings reflect that Allo was biased against him because he was Jewish, and that Allo's employer told him that he wanted Giuca "to fry."  Neither of these claims were raised in Giuca's motion; accordingly the Appellate Division, where they were raised for the first time, refused to consider them. *Giuca*, 78 A.D.3d at 730.

Where a claim has not been exhausted in state court, AEDPA permits a district court to deny the claim on the merits if it is "patently frivolous."  *See* 28 U.S.C. § 2254(b)(2); *see also Pacheco v. Artuz*, 193 F. Supp. 2d 756, 761 (S.D.N.Y. 2002) (recognizing that district courts are permitted to deny a § 2254 petition on the merits where unexhausted claims are "patently frivolous").  The Court finds that both of these unexhausted juror misconduct claims may be denied on their merits.  First, the record does not clearly reflect that Allo's employer said he wanted Giuca "to fry": after discussing the employer's reluctance that Allo miss work because of jury duty, Giuliano asks Allo, "what was [your boss's] opinion [of the case]?"  Allo then responds:  "(inaudible) He wanted to see that fucking kid fry."  Recording dated Nov. 2007.  Even accepting that Allo's employer told Allo that he wanted Giuca "to fry," there is no information in the recordings as to when the employer supposedly made this statement.  Furthermore, the recordings do not reflect that

13

Allo agreed with this alleged statement or otherwise took it into account in reaching his verdict.

Likewise, the recordings do not establish that Allo harbored anti-Semitic sentiments—rather, Allo discusses reasons given by jurors that would excuse them from service: "The number one excuse: 'I'm prejudiced. I hate Jews.' That's how most people get out." Recording dated Nov. 2007. Finally, even assuming Allo knew of Giuca's religion during the trial, Giuca has not provided any basis to conclude that this awareness played any role in Allo's verdict.

## CONCLUSION

Giuca's § 2254 petition is denied. As he has not made a substantial showing of a denial of his constitutional rights, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
May 14, 2013

14